**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | Case Number: 16 CR 734 |
| | ) | |
| v. | ) | |
| | ) | |
| FLOYD O'HARA | ) | |
| Defendant. | ) | |

**FLOYD OHARA'S OFFENSE LEVEL CALCULATIONS AND OBJECTIONS TO THE**
**PRE-SENTENCE REPORT**

**NOW COMES,** Mr. Floyd O'Hara, by his attorneys Gal Pissetzky and Adam Bolotin, and files the following Offense level calculations and objections to the pre-sentence investigation report:

## I.     Introduction

Mr. O'Hara was charged with one Count of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) (Count One); one Count of stealing property of the United States in violation of 18 U.S.C. § 641 (Count Two); and two Counts of altering an object's integrity and availability for use in an official proceeding in violation of 18 U.S.C. § 1512(c)(1) (Counts Three and Four).

Mr. O'Hara pled guilty only to Count Four in "that on or about April 5, 2016, he corruptly altered the hard drive of a Dell Optiplex 755, Serial #J1F3BH1,[1] with the intend [*sic*] to impair the object's integrity and availability for use in a prosecution for allegation of possession of child pornography." (Dk #58 at 2). Thus, Mr. O'Hara's only offense of conviction involved acts committed on April 5, 2016 that altered the work computer. Under these specific facts, Mr. O'Hara's offense level should not be increased pursuant to USSG § 2G2.2 because he never

---

[1] Hereinafter referred to as "work computer".

1

possessed any child pornography on the work computer and other alleged child pornography found on another computer at his home does not fit the definition of relevant conduct.

## II.    <u>Offense Level Calculations</u>

### A.  Background on the investigation

Before delving into the appropriate guideline calculation, it is important to clarify what law enforcement actually uncovered in this case. Law enforcement never discovered any evidence that Mr. O'Hara ever searched for, began downloading, or fully downloaded a single child pornography file on the work computer he pled guilty to altering. The investigation only determined that a certain IP address (173.15.56.62), later to be connected to a Chicago office of the U.S. Environmental Protection Agency and Mr. O'Hara, "queried" approximately 16 torrents that contained child pornography videos. It is that piece of evidence -that the EPA IP address queried 16 torrents – is the only kind of evidence that child pornography files were in any way connected to Mr. O'Hara's work computer. As will be detailed further below, querying torrents is not tantamount to or even indicative of searching for, beginning to download, or fully downloading child pornography files.

Querying torrents simply means the BitTorrent software is broadcasting that a user is associated with a torrent. Disconcerting, the most innocuous activity can cause Tribler -the BitTorrent software in this case- to broadcast that users are associated with torrents. The process of Tribler broadcasting that a user is associated with a torrent, *i.e.* querying, can be described through this example. After downloading the BitTorrent software program Tribler, a user may search for a music album. Similar to Google, the user enters a search term for the album into the Tribler program. In response to the term entered, Tribler generates and displays a list of torrents it believes are responsive to the user's search. The list of torrents is not the actual album music, but is similar to a folder that presumably contain the album file responsive to the search, along with

other files that may contain the album's song names, its cover art, and information about the artist. The actual album's music does not exist or has been downloaded. The problem is, Tribler's algorithm is nowhere near as accurate as Google's. Consequently, in response to the user's search for the album, Tribler will generate a list offering hundreds of torrents that are not responsive to the user's search.

For instance, in testing the Tribler software program, Forensic Expert Tami Loehrs entered the search term "magazine." (Report of Testing at 5). In response to "magazine," Tribler offered 173 torrents not all offering magazines. (*Id.*). On another search, Ms. Loehrs entered the word "real." In response, Tribler offered numerous torrents holding child pornography files, including the very same torrents cited by Detective Wistocki in this case. (*Id.* at 7). Ms. Loehr's test reveals that Tribler offers child pornography torrents in response to even the most innocuous search terms. Critically, Tribler broadcasts that the user queried every irrelevant torrent it offered in response to the user's innocuous search terms. Ms. Loehr's test also revealed that even torrents purportedly offering responsive files are not always responsive to the user's search.

In response to one of Ms. Loehrs' searches, Tribler listed a torrent purportedly offering the Ubuntu software program, a publicly available and legally downloadable open source software program. (*Id.* at 5). Before downloading the torrent, Ms. Loehrs accessed it to see what files it contained. Upon accessing the Ubuntu torrent, it became clear the torrent was not as advertised by Tribler. Instead of containing the Ubuntu software program, the torrent included a file titled "Sin City," which is clearly not the Ubuntu software. (*Id.*). Accordingly, Tribler offers torrents solely based on its name irrespective of the file the torrent actually contains. The issues associated with what Tribler broadcasts as a queried torrent only continue.

In addition to broadcasting that users queried irrelevant torrents generated in response to innocuous search terms, Tribler also includes torrents based on an artificial intelligence (A.I.)

3

function. In theory, the function should operate similar to Amazon, where after a user searches for a certain product, Amazon records that search, and then generates a list of other products it believes the user may like. Unfortunately, Tribler's A.I. is even more defective than its search results. Tribler's A.I. is over inclusive and does not collect torrents and files based on their actual content's similarity to the user's searches or downloads, but rather collects them simply because they are located on the same channel or server, have the same file format (i.e. they are a video or image), or are most popularly distributed on the network. Accordingly, Tribler's A.I. function inaccurately broadcasts that users are associated with, *i.e.* queried, torrents and files that the user never searched for, began to download, let alone fully downloaded.

These issues are not merely hypothetical but actually manifested during forensic testing. As detailed above, simply querying files or having Tribler offer a list of torrents in response to a search term does not mean that the user has downloaded or initiated downloading the files located within the torrent. The user does not possess the album or begin to download the album's music, unless and until, the user downloads the entire torrent, or the specific album file located within the torrent.

During the Tribler testing, Ms. Loehrs only selected two Ubuntu software files for download. (*Id.* at 3, 8). Though Ms. Loehr's only downloaded two legally obtainable files, Loehrs & Associates received several emails from Century Link indicating that Loehrs & Associates was flagged for downloading over 70 files subject to DMCA copyrights. The files included movies, tv shows, and pornography. (*Id.* at 9-10). After exhaustive forensic testing, none of the 76 files allegedly downloaded were found anywhere on the test computer. (*Id.* at 18). Ms. Loehrs ran keyword searches to find any evidence of the offending files. (*Id.* at 18). The only trace of the files was found within a file titled tribler.sdb, a file that Tribler created upon Ms. Loehrs' downloading of the Tribler software program. (*Id.*). The tribler.sdb file is comparable to an Excel spreadsheet

4

that contains torrent and file names. Ms. Loehrs review of the tribler.sdb file revealed the names of the two torrents that held the Ubuntu files Ms. Loehrs actually downloaded, along with names of 22 additional torrents that were not downloaded or searched for. (*Id.* at 19). Torrent names indicative of child pornography were amongst the 22 additional torrents. (*Id.* at 20). Additionally, the tribler.sdb file contained hundreds of file names indicative of child pornography. (*Id.* at 20). The very same torrent and file identified by Detective Wistocki was among those listed in the tribler.sdb spreadsheet. (*Id.*). Tribler created this spreadsheet that contained information about child pornography torrents and files despite Ms. Loehrs never searching for, downloading, or fully downloading such files. Possessing a list of file names, similar to a spreadsheet, is not illegal by any means.

Clearly, there are deeply disturbing issues with the Tribler software program. The program offers child pornography torrents in response to innocuous search terms; offers torrents that purportedly contain files responsive to legitimate searches when they in fact do not; and finally, represents to the world that users have associated with, *i.e.* queried, illegal files the user did not searched for, began to download, or fully downloaded.

All of these profound issues substantially negate the significance of the agents' assertion that Mr. O'Hara queried certain torrents from the work computer before altering it; moreover, such a discovery can in no way support a conclusion that Mr. O'Hara ever searched for, began downloading, or fully downloaded any child pornography onto his work computer.

With this in mind, we can turn to the underlying circumstances of the offense Mr. O'Hara pled guilty to. Mr. O'Hara did not learn about the investigation until he was notified by an EPA Office of Inspector General Special Agent on March 31, 2016. Mr. O'Hara obtained the altering software on April 5, 2016. By then, law enforcement already accessed the work computer's IP address but never discovered any evidence that Mr. O'Hara ever downloaded child pornography.

The Detective attempted to download images directly from Mr. O'Hara's work computer before Mr. O'Hara or anyone at the EPA was ever aware of an investigation, but could not make a single source download. Rather, the Detective only observed the computer *query* 16 torrents in January 2016. As detailed above, querying torrents does not mean that Mr. O'Hara downloaded a single child pornography file. Querying torrents is not illegal! Both the government and probation gloss over this imperative fact. This court cannot.

The evidence before this court indicates that no child pornography files ever existed on the work computer before Mr. O'Hara implemented the wiping software or at any other time. Though Mr. O'Hara executed the software there is no evidence that it deleted any child pornography files. Accordingly, this court cannot enhance his guideline calculation based on child pornography files that never existed on his work computer.

**B.  Mr. O'Hara's Total Offense Level is 12**

The guideline for 18 U.S.C. § 1512(c)(1) is USSG §2J1.2. Pursuant to that guideline, Mr. O'Hara's total offense level is 12. Mr. O'Hara pled guilty to Count Four, which charged him with on or about April 5, 2016 altering his work computer, causing it to be unavailable for use in a prosecution resulting from the *investigation* into possession of child pornography on the work computer. USSG § 2J1.2 carries a base offense level of 14. The two level enhancement for altering an essential or especially probative record, document, or tangible object does not apply because there is zero evidence that any child pornography existed on the work computer Mr. O'Hara altered. USSG §2J1.2(b)(3)(B). Pursuant to 2J1.2(c), § 2X3.1 and subsequently 2G2.2 do not increase the offense level because while the offense involved obstructing the *investigation* of possession of child pornography, the resulting offense level under the possession of child pornography guideline is not greater than 14.

6

The obstruction guideline directs the court to apply §2X3.1(a) Accessory After the Fact. That section provides the offense level is "six levels lower than the offense level for the underlying offense." The guideline's commentary defines 'underlying offense' as "the offense as to which the defendant is convicted of [obstructing]." §2X3.1 n. 1. Here, Mr. O'Hara pled guilty to obstructing an investigation into the possession of child pornography on the work desktop computer, the Dell Optiplex 755, by altering the computer's hard drive on April 5, 2016, in violation of 18 U.S.C. § 2252A(a)(5)(B). The base offense level for § 2252A(a)(5), pursuant to Guideline § 2G2.2(a)(1), is 18. None of § 2G2.2(b)'s enhancements apply because not a single piece of child pornography was ever found on that computer and there is no evidence that a file ever existed on the work computer. The government bears the burden of showing by a preponderance of the evidence that its cited enhancements apply: *i.e.* that the material involved a minor under the age of 12; the material portrayed sadistic or masochistic conduct or other depictions of violence; the offense involved the use of a computer to possess, transmit, receive or distribute or accessing with intent to view material; and the offense involved 600 or more images. As detailed above, there is no evidence that Mr. O'Hara ever possessed, or was in the process of downloading child pornography files on his work desktop Dell OptiPlex 755, Serial # J1F3BH1, let alone the types of child pornography that warrant enhancements advocated by the government.

Relevant Conduct

The government and probation incorrectly argue to enhance Mr. O'Hara's guideline calculation by claiming evidence found on his home computer[2] is relevant conduct to the offense Mr. O'Hara pled guilty to. The government does not provide specific reasoning as to why the files amount to relevant conduct as defined by the guidelines, and probation asserts that because child

---

[2] When executing the search warrant at Mr. O'Hara's home, agents seized the home computer and a thumb storage drive. Both contained the same exact files. Whenever the home computer is referred to in this memo, it also incorporates and includes the material found on the thumb storage drive.

pornography on Mr. O'Hara's home computer and thumb drive were "found in relation to the underlying investigation," it "is relevant conduct to the instant offense of conviction." Such a basis misstates the definition of relevant conduct.

Relevant conduct is defined as acts committed by the defendant "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." USSG § 1B1.3(a)(1)(A). Other descriptions of relevant conduct do not apply in this case. Subsection 1(B) which refers to cases of jointly undertaken criminal activity does not apply because Mr. O'Hara did not commit acts in concert with others. USSG § 1B1.3(a)(1)(B). Subsection 2 also does not apply because Mr. O'Hara was convicted of a single count and is accordingly not subject to grouping rules. USSG § 1B1.3(a)(2); *see also* USSG § 2J1.2 n. 2 (citing USSG § 3C1.1 n. 8) (requiring the defendant to be *convicted* of obstruction *as well as* the underlying offense that is the object of the obstruction for grouping to trigger). Thus, for the contraband found on Mr. O'Hara's home computer to amount to relevant conduct, the government must establish by a preponderance of the evidence that Mr. O'Hara possessed the pornography on his home computer while he was committing, preparing to commit, or while he was attempting to avoid detection or responsibility for altering his work computer's integrity and availability. The timing of Mr. O'Hara's acts that amount to his offense of conviction compared to when the home pornography was possessed prohibits such a finding.

Mr. O'Hara committed the offense he pled guilty to by corruptly altering his work computer's hard drive on or about April 5, 2016. (Dk 58 at 2). Accordingly, the commission of his offense ended on April 5, 2016. When law enforcement executed the search warrant on Mr. O'Hara's home, the oldest child pornography file finished downloading sometime around June 2, 2016. There was no evidence that Mr. O'Hara altered, or attempted to alter, his home computer at any time. Thus, Mr. O'Hara's possession of the home files could not have been in preparation for

Case: 1:16-cr-00734 Document #: 73 Filed: 12/03/18 Page 9 of 16 PageID #:1474

his obstruction offense committed on April 5 because they were downloaded after, not before, he altered the work computer. Moreover, there is no evidence that Mr. O'Hara downloaded the home files in plans of deleting them to test the altering software's capabilities before executing it on the work computer. Similarly, Mr. O'Hara did not possess the home files during the commission of his offense because they did not exist, *i.e.* he did not possess them, when he altered the work computer on April 5. Finally, he did not possess these files while attempting to avoid detection – in fact, the opposite is true. Law enforcement discovered these files as they were being downloaded to the home computer while the Agents were executing the search warrant. Accordingly, the files found on the home computer do not fit any of the definition's provisions and cannot amount to relevant conduct.

Probation, and seemingly the government, both incorrectly argue the files amount to relevant conduct simply because they were possessed close in time to Mr. O'Hara's conduct of conviction and were similar to the offense he was investigated for. Such contentions do not adhere to relevant conduct's clear definition and were soundly rejected by multiple Circuits. Specifically, in *United Sates v. Schock,* the defendant was charged with exploiting Victim 1 in October 2011 (Count 1), June 2013 (Count 2), September 2013 (Count 3), and exploiting Victim 2 in August 2014 (Count 4), as well as one count of possessing child pornography (Count 5), because the defendant took pictures and videos of children other than those connected to counts 1 through 4. 862 F.3d 563, 565 (6th Cir. 2017). The defendant pled guilty only to Count 3, specifically admitting that he had taken four photographs of Victim 2 in September 2013. *Id.* The district court applied a two level enhancement because the defendant's relevant conduct of his offense of conviction included more than one minor being exploited. *Id.* at 566, 567 (citing USSG § 2G2.1(d)(1) cmt. n.7). The defendant appealed arguing the exploitation of Victim 1 was not

conduct charged in Count 3 and was not relevant conduct. *Id.* at 566. The Sixth Circuit agreed. *Id.* at 567.

In reaching its decision, the appellate court concisely settled that the exploitation of Victim 1 could only amount to relevant conduct if the defendant exploited her during the commission of, preparation for, or course of attempting to avoid detection exploiting Victim 2 as pled to in Count 3, the only offense the defendant was convicted of committing. *Id.* at 567 (citing USSG § 1B1.3(a)(1)). The government contended the defendant's acts relating to Victim 1 were relevant conduct because they were "close in time and similar in nature to the offense in the count of conviction." *Id.* at 567. The *Schock* court disagreed and held the definition required more. *Id.* Specifically, the court emphasized Count 3 and its factual basis "unambiguously cabin[ed] the offense conduct to [the defendant's] photography of Victim 2 '[o]n or about September 5, 2013.'" *Id.* at 258 (quoting the indictment). There was no evidence that the defendant photographed the victims together, or that Victim 1 was photographed in September 2013. *Id.* at 569. Rather, the PSR only identified Victim 1 being photographed on August 25, 2014. *Id.* at 568-69. Because the exploitation of Victim 1 occurred in August 2014 after the commission of photographing Victim 2 in September 2013 the court held the government did not establish the defendant's conduct with respect to Victim 1 occurred during the commission of his offense of conviction as required by the relevant conduct definition. *Id.* at 569. The Second Circuit reached the same conclusion even where separate acts occurred during the same period of time.

In *United States v. Wernick*, the defendant was convicted of one Count (Count Five) of enticing underaged individuals to engage in sexual activity, amongst other convictions. 691 F.3d 108, 112 (2d Cir. 2012). At trial the government introduced evidence that the defendant attempted to meet two male teenagers and an additional three more at sentencing. *Id.* at 111. At sentencing, the government also introduced evidence of the defendant's efforts to meet and molest three

children under the age of five. *Id.* In fashioning the defendant's Count Five offense level, the trial court determined the attempted acts of molestation against the young children amounted to relevant conduct to the defendant's conviction for abusing the teenagers. *Id.* at 112. The Second Circuit reversed.

In agreeing with the defendant's argument that his actions relating to the younger children were not relevant conduct to Count Five, the court emphasized the Guidelines' definition of relevant conduct. Analyzing relevant conduct's definition, the court determined its holding "depend[ed] on whether the offense against the young children 'occurred during the commission of' the crimes against the teenagers, 'in preparation for that offense, or in the course of attempting to avoid detection of responsibility for that offense.'" *Id.* at 114 (quoting USSG § 1B1.3(a)(1)(A). The government argued the young children conduct occurred during the commission of the teenager conduct because defendant abused teenagers during 1999 and from March through September of 2001 and engaged in the misconduct against all the young children during those periods. *Id.* at 114. The Second Circuit disagreed and focused on the fact that there was no evidence that the defendant simultaneously engaged in sexual activities with teenagers and young children or was able to use the pursuit of sex with children to persuade the teenagers to have sex with him. *Id.* at 116. Because there was no connection between the acts, the mere temporal proximity did not make them relevant conduct as defined by the guidelines. *Id.* at 116-17.

This court should follow the Second and Sixth Circuits guidance on relevant conduct. Here, just like *Schnock,* the indictment and Mr. O'Hara's plea's factual basis specifically limited his offense conduct of conviction to April 5, 2016. Mr. O'Hara did not plead guilty to altering the hard drive after April 5, 2016 or altering a computer other than the work computer. Moreover, just like in *Wernick,* there is no evidence that altering the work computer on April 5 did not allow him to possess the home files on June 2. The act Mr. O'Hara pled guilty to occurred months before Mr.

O'Hara ever possessed the files cited by the government and probation. The circumstances facing this court bar a finding that the later child pornography found on the home computer amounts to relevant conduct.

Moreover, the alleged possession of child pornography on the home computer cannot be relevant conduct to the offense of conviction because that offense is an obstruction offense. Despite being an obstruction offense alleging the obstruction of an *investigation* into child pornography, the alleged child pornography on the home computer cannot be considered an additional *obstruction offense* that might be relevant conduct to the offense of conviction. After April 5, 2016, Mr. O'Hara used the erasing software he installed on his work computer on multiple occasions until June 2, 2016. As such, he might have committed additional obstruction offenses that might be considered relevant conduct, which would be grouped together under USSG § 3D1.2(b). But, any other offenses, including the alleged possession of child pornography on the home computer, could not be considered similar in nature, part of the same *modus operandi*, or part of the same course of conduct or common scheme or plan. USSG § 1B1.3(a)(2). Accordingly, the files found on Mr. O'Hara's on home computer cannot be used as a basis to enhance Mr. O'Hara's offense level under USSG § 2G2.2.

Correct Guidelines Calculation

Mr. O'Hara's offense level is correctly calculated as follows: as detailed above, the offense level under § 2G2.2 should not be increased based on files found at Mr. O'Hara's home computer and should remain 18. Six levels less than 18 is 12, thus Mr. O'Hara's offense level remains 14 as calculated under §2J1.2.

The two level role adjustment enhancement for abusing a position of trust or special skill, under USSG § 3B1.3 should not apply. The guideline's notes provide "'public or private trust' refers to a position of public or private trust characterized by professional or managerial

12

discretion." USSG § 3B1.3 cmt n.1. Persons in such positions "are subject to significantly less supervision that employees whose responsibilities are primarily non-discretionary in nature." *Id.* There is no evidence that Mr. O'Hara was subjected to less supervision than other EPA IT employees the special agents were investigating. Moreover, Mr. O'Hara did not commit this offense by employing a specialized skill. The guideline defines such skills as those "not possessed by members of the general public," and usually require "substantial education, training or licensing." *Id.* at cmt. n.4. On the contrary, Mr. O'Hara downloaded and executed very common and well known publicly available software. There is no evidence that obtaining the software or executing it required specialized training. A specialized skill is not needed for one to click download, a skill that any 5th grader possess these days.

Mr. O'Hara receives a two-level reduction for accepting responsibility, resulting in a total offense level is 12. Combined with Mr. O'Hara's zero history points and criminal history category I, Mr. O'Hara's guideline range is 10-16 months.

### III.    Objections to the Pre-Sentence Report

In addition, Mr. O'Hara raises the following objections to the Pre-Sentence Report. In ¶ 15, probation contends that "law enforcement was unable to analyze the [EPA issued laptop computer's] hard drive [because] it had been encrypted by [Mr. O'Hara], who refused to provide the encryption key." That is a false statement. The hard drive was encrypted by the United States Environmental Protection Agency, not Mr. O'Hara. As such, the USEPA holds the encryption key, not Mr. O'Hara. Mr. O'Hara does not know the encryption key and had no ability to provide the key to law enforcement.

In ¶ 17, probation reports that during his interrogation, Mr. O'Hara stated that he downloaded the child pornography videos 'out of curiosity.' Such a characterization is taken out of context and falsely implies that Mr. O'Hara was curious about children engaged in preforming

sex acts. To put in context, during the interrogation, Mr. O'Hara agrees that he hit the torrent titled "pthc preteen sex incest (REAL THING)," but was not sure what was inside the torrent. (Interview at 53:05 – 53:12). The officer confronts Mr. O'Hara with the fact that the torrent's title is 'pthc' and asks him what he knows that term to mean. (Interview at 53:12 – 53:21). In response, Mr. O'Hara states that he selected the torrent to download "out of curiosity of what that is," adding that he hasn't "even see the file yet." (Interview at 53:35 – 53:40). Later, Mr. O'Hara states that he was 'curious' what 'pre-teen' is (Interview at 54:07- 54:09); that his "curiosity was, is it really for real that it's there," and that "tribler would actually pick that up." (Interview at 1:27:45 – 1:28:02). Finally, in response to the officers' questioning him why he was curious about 'pthc young kids real thing,' Mr. O'Hara replied that this torrent picked his attention because he could not believe it popped up, and that Tribler would actually advertise that torrent when he only searched for adult pornography. (Interview at 1:36:31 – 1:37:16).

In proper context, Mr. O'Hara's statements indicate that he was not curious about children having sex, but rather that he was not sure what the terms meant, and that he was shocked the files existed on Tribler and were responsive to his searches for adult pornography. Importantly, the forensic testing of Mr. O'Hara's computer revealed that the only trace of actual child pornography ever existing on the home computer was the single torrent that was in the process of downloading when the officers executed the search warrant. Moreover, and most significant, there is no evidence that Mr. O'Hara ever viewed these files or knew their contents.

Respectfully submitted,

/s/ Gal Pissetzky
Gal Pissetzky and Adam Bolotin
Attorneys for Floyd O'Hara
53 W. Jackson Blvd., Suite 1515
Chicago, IL 60604
(312) 566-9900

14

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, Gal Pissetzky, hereby certifies that in accordance with Fed.R.Crim.P. 49,

Fed.R.Civ.P. 5, and the General Order on Electronic Case Filing (ECF), the

**FLOYD O'HARA'S OFFENSE LEVEL CALCULATIONS AND OBJECTIONS TO THE
PRE-SENTENCE REPORT**

was served on December 3, 2018 pursuant to the district court's ECF filers to the following:


Assistant United States Attorney
219 S. Dearborn St., 5th Floor
Chicago, IL 60604


Respectfully submitted,

/s/ Gal Pissetzky
Gal Pissetzky
Attorney for Floyd O'Hara
53 W. Jackson Blvd., Suite 1515
Chicago, IL 60604
(312) 566-9900