**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISON**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>    Plaintiff, )<br>)<br>        v. )<br>)<br>FLOYD O'HARA )<br>    Defendant. ) | Case Number: 16 CR 734 |

**FLOYD OHARA'S SENTENCING MEMORANDUM**

**NOW COMES,** Mr. Floyd O'Hara, by his attorneys Gal Pissetzky and Adam Bolotin, and files the following Sentencing Memorandum:

**I.    Introduction**

Floyd O'Hara ("Mr. O'Hara) is a 63-year-old loving son, husband, and father of five children. Throughout his life, Mr. O'Hara has worked hard to make a better life for himself and those who he cares for. Mr. O'Hara comes before this Court ready and willing to be held accountable for his actions, knowing that he has put so much in jeopardy by his actions. Mr. O'Hara implores this Court to resist the urge to simply close the door and throw away the key on a person who has great potential to continue to be a productive and contributing member of society. Indeed, Mr. O'Hara has been subjected to home confinement since his arrest. In over two years of being monitored, Mr. O'Hara has not had a single violation. As will be further expounded upon below, a sentence alternative to incarceration that continues these strict conditions is "sufficient, but not greater than necessary" to effectuate the goals of sentencing established by Congress. 18 U.S.C. § 3553(a).

**II.    Sentencing Memorandum**

At 63-years-old, Mr. O'Hara is a man who has worked his entire life to help and provide for those he loves. The underlying circumstances of Mr. O'Hara's offense coupled with Mr.

1

O'Hara's personal characteristics support a sentence alternative to incarceration. Such a sentence would not only sufficiently punish Mr. O'Hara, but would also accurately reflect the deterrent and rehabilitative goals of sentencing. Such a sentence is not only feasible, but appropriate, and would clearly be "sufficient, but not greater than necessary" to comply with the goals of sentencing established by Congress. 18 U.S.C. § 3553(a).

**A. Sentencing Considerations Pursuant to 18 U.S.C. § 3553(a) Support a Sentence Alternative to Incarceration**

After first calculating the applicable sentencing range, district courts are then tasked with imposing a sentence that is reasonable under 18 U.S.C. § 3553(a). Over a decade ago, the United States Supreme Court ruled that the Sentencing Guidelines are only advisory in nature. *United States v. Booker*, 125 S. Ct. 738, 765-67 (2005). As a result, this Court maintains unfettered discretion to fashion a sentence that punishes the offender, as opposed to just the crime. *Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229, 1240 (2011). Though appellate courts presume a guideline sentence is reasonable, a guideline sentence is not reasonable *per se*. *United States v. Cunningham*, 429 F.3d 673, 676 (7th Cir. 2005). In fact, sentencing courts can treat the applicable guideline range as presumptively unreasonable. *Nelson v. United States,* 129 S. Ct. 890, 891 (2009). The guideline range is only but a single factor for this Court to consider. *Kimbrough v. United States,* 552 U.S. 85, 92 (2007). A sentence's reasonableness "depends on its conformity to the sentencing factors set forth in 18 U.S.C. § 3553(a)(2)." *Cunningham*, 429 F.3d at 675. As the parsimony provision commands, sentencing courts shall only impose "a sentence sufficient, but not greater than necessary to comply with the purposes set forth" under 18 U.S.C. § 3553. *United Sates v. Dean*, 414 F.3d 725, 728 (7th Cir. 2005). So long as the selected sentence is "rooted in § 3553(a), a sufficiently individualized to the circumstances of [the] case, and generally associated

with sentencing leniency[,]" a below guidelines sentence is appropriate. *United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007).

In issuing a sentence that reflects this directive, Section 3553(a) specifically directs courts to consider:

"the nature and circumstances of the offense and the history and characteristics of the defendant;

the kinds of sentences available;

the defendant's guidelines range;

any relevant policy statements;

the need to avoid unwarranted sentence disparities among defendants with similar records;

who have been found guilty of similar conduct; and

the need to provide restitution to any victims of the offense."

18 U.S.C. § 3553(a). The statute further directs the sentencing court to impose the shortest sentence possible that (A) reflects "the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" (B) deters future criminal conduct; (C) protects the public from the defendant; and (D) provides the defendant with the "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553.

In fashioning his sentence that is sufficient but not greater than necessary, Mr. O'Hara respectfully asks this Court to consider the nature and circumstances of the offense, his personal history, his ruined reputation, and the collateral consequences he faces as a result of these federal convictions.

**1. Nature and Seriousness of the Offense**

The nature circumstances of the offense are spelled out in great in Mr. O'Hara's Objections to the PSR. Mr. O'Hara firmly disputes that any illegal files were ever located on his work computer. There is simply zero evidence that Mr. O'Hara ever searched for, downloaded, or possessed any child pornography on his work computer. Mr. O'Hara firmly contends any files that were found on his home computer are simply not relevant to this court's sentencing determination, and moreover, were found after an illegal search of his home. Mr. O'Hara only pled guilty to and is being sentenced for obstructing the government's investigation into child pornography being downloaded from within the EPA offices.

In any event, the government's version profoundly overstates the extent of the downloading that occurred from Mr. O'Hara's home IP address. Specifically, the government attached Mr. O'Hara's home IP address' purported history from the ICAC COPS database -an endless list of torrents and files. The leap the government seemingly asks this court to take is that Mr. O'Hara once possessed each and every file listed on his computer. Nothing could be further from the truth. These exhibits only indicate that Mr. O'Hara queried a torrent that listed the torrents and files listed. As detailed thoroughly in Mr. O'Hara's Objections to the PSR filing, querying torrents or files does not mean that a user searched for, began to download, or possessed a specific torrent or file. Querying is not illegal! Indeed, the physical evidence recovered –17 total devices, including desktop and laptop computers, tablets, servers, hard drive, thumb drives, and routers- bely the conclusion that Mr. O'Hara ever possessed anywhere near the amount of files listed in the government's exhibits. Law enforcement recovered a single downloaded torrent containing 16 files. There was no evidence that Mr. O'Hara executed a cleaning software on any of his home devices. Moreover, it is simply inconceivable for a cleaning wiping software to eradicate all traces of the thousands of files the government seemingly contends Mr. O'Hara possessed.

While one file is one too many, it is simply incorrect to presume, let alone conclude, that Mr. O'Hara possessed additional files beyond what was discovered the day the law enforcement executed the search warrant. Moreover, this court should not ignore the fact that there is no evidence that Mr. O'Hara ever viewed any of the child pornography cited, and admittedly, he could not believe such horrific content existed on Tribler let alone was offered in response to his searches for adult pornography.

Though Mr. O'Hara may disagree with the government and probation on his offense's specifics, he firmly agrees that interfering with a government investigation is undoubtedly a serious offense. Mr. O'Hara regrets ever installing the software program and is utterly ashamed of betraying the investigators and his employer who he had served honorably for over 30 years. He is deeply ashamed with himself and knows his actions not only affected his life, but also the lives of those he loves and cares for. Mr. O'Hara's wife and youngest daughter were home the day law enforcement executed the search warrant. He will forever live with the shame of knowing he caused the most traumatic experience of their lives.

Mr. O'Hara's choices were stupid; however, no person is defined by the worst thing he or she has ever done. Mr. O'Hara is motivated to get his life back and will do everything he can to make amends and re-earn the respect and trust of those he has wronged.

**2. Mr. O'Hara's History and Characteristics**

For the 63 years preceding this offense, Mr. O'Hara led the life of a model citizen and truly achieved 'The American Dream.' Mr. O'Hara was born in the Philippines to two loving parents. Together, his mother and father raised Mr. O'Hara along with seven siblings and created a loving, stable childhood. When Mr. O'Hara was 23, his father emigrated to the United States. Mr. O'Hara, his mother, and two siblings followed a few years later. The family settled in Naperville, Illinois

where they have resided since 1981. Days before his 30th birthday, Mr. O'Hara became a naturalized United States Citizen. It was one of the proudest days of his life.

Throughout his young life, Mr. O'Hara pursued his education, worked, and served our country. Mr. O'Hara pursued and earned degrees in computer science while serving in the Air Force. Mr. O'Hara graduated just before being Honorably Discharged in 1986. He continued serving in the Air Force reserve for two more years before obtaining a job at the EPA where he worked for 30 years without any allegations of misconduct.

Of his life's achievements, none shine brighter than his children. Mr. O'Hara and his loving wife, Fides, raised their children to value education and hard work. Fides O'Hara writes that she does not know how she could have raised their children without Mr. O'Hara's help and support. All but their youngest daughter, Gabby, who is a nursing student, have moved out after pursuing and obtaining rewarding careers. Their success is a true testament to Floyd's presence in their lives.

Byron O'Hara, Mr. O'Hara's oldest child writes that his father "is always there for [him whenever [he] need[s] his help." Byron further asserts that without Mr. O'Hara showing him "what hard work looks like, there's no way [he] could have made it" through demanding medical school or in life. Gabby O'Hara describes her father spending every moment possible by her side. She explains how her dad would bring her along on his weekend runs, and never missed a single one of her games. Gabby asserts that her "family would not be the same without" her dad. Gabby firmly believes she and her siblings "are successful in their own ways" because of their dad.

Though their home was plenty full, Mr. O'Hara never turned those in need away. When Mr. O'Hara's sister and husband immigrated from the Philippines to the United States, Floyd was the first to volunteer to help them out. Dr. Alvin Nayan, Mr. O'Hara's brother in law, describes how the couple was "struggling immigrants" when they arrived, but Floyd welcomed them into

6

his home and even gave them a head start financially without question. Mr. O'Hara's generosity continued when the couple moved to Seattle. Dr. Nayan describes how Floyd flew out on his own time to help set up Dr. Nayan's business's computer system. Dr. Nayan asserts that neither he nor his wife would have "reach this level of success without Floyd's generosity and kindness."

These are just some of the sincere words said on Mr. O'Hara's behalf. Even after his arrest, Mr. O'Hara has continued to live a life dedicated to helping others. He served as his parents' primary caretakers after his mother, who suffered from pancreatic cancer, and father, who developed advanced Alzheimer's, moved into his home. He administered his mother's medicine, with the court's permission drove her to doctor appointments and cared for her in her dying days. Floyd's father's Alzheimer's was so aggressive that he stopped eating. Even more heartbreaking, his father only allowed Mr. O'Hara to come near him or help him. Floyd fed, bathed, and clothed his father until the disease ran its course. Over the past year, Floyd watched both his parents become shells of the people who raised him as they passed away mere months a part.

Losing his parents so close apart and during the lowest point of his own life was truly painful, yet somehow Floyd used the experience to cherish the moments he has with those who are still living. Thankfully, Floyd has the strong support of his wife, children, and friends. All push him towards moving past his offenses and never reoffending.

### 3. Recidivism and Deterrence

Mr. O'Hara poses absolutely no threat or risk of re-offending. As a 63-year-old first time nonviolent offender, with a significant role in his family, community, with a long history of steady employment, there is nothing to suggest Mr. O'Hara poses any threat or risk of committing another criminal offense. Mr. O'Hara's zero violations while monitored by pre-trial services for the past two years shows that he is rehabilitated and will never reoffend again. Moreover, the psychologist who evaluated Mr. O'Hara, as required by pre-trial services, did not recommend Mr. O'Hara seek

or complete treatment relating to sex offenders because he did not pose a risk. Indeed, the numerous character letters submitted on behalf of Mr. O'Hara conclusively demonstrate the uncharacteristic nature of his conduct that landed him before this Court.

As for deterrence, it is usually divided into two subcategories, specific and general. Of course, specific deterrence is to deter Mr. O'Hara from committing obstruction, or any other crime again. Mr. O'Hara has been convicted of a federal offense. Suffice it to say he has learned his lesson, is terrified of the federal criminal justice process, and never wants to go through this process again. He is specifically deterred from committing *any* crime, much less obstructing a federal investigation.

As to general deterrence, a message certainly needs to be sent to the community at large obstruction will not be tolerated and will be significantly punished. Here is how the certainty, rather than the severity of punishment will deter the general public: word will get out concerning Mr. O'Hara's conviction, either through the media or word-of-mouth. The public will know that Mr. O'Hara got caught, punished, and forever branded a federal felon. We submit that Mr. O'Hara's conduct will be viewed as particularly short sited and unworthy to a person in his shoes. The public will be sufficiently deterred by a punishment alternative to incarceration.

Indeed, it is the *certainty* of punishment, not its severity, that deters crime. *See United States v. Kloda*, 133 F. Supp. 2d 345, 347-48 (S.D.N.Y. 2001) (Hellerstein, J.) (in context of business crimes); *Sentence Severity and Crime: Accepting the Null Hypothesis,* 30 Crime & Just. 143 (Univ. of Chicago 2003) (arguing that severity of punishment does not deter crime); Jeffrey Grogger, *Certainty vs. Severity of Punishment*, 29 Econ. Inquiry 297, 308 (1991) (concluding increased certainty of punishment generates significant deterrent effects while increased severity produces insignificant results); William N. Trumbull, *Estimations of the Economic Model of Crime Using Aggregate and Individual Level Data*, 56 S. Econ. J. 423, 427-37 (1989) (analyzing data to

conclude certainty of punishment has greater deterrent effect than severity); Ann Dryden Witte, *Estimating the Economic Model of Crime with Individual Data*, 94 Q.J. Econ. 57, 81-83 (1980) (maintaining certainty of punishment produces greater deterrent effect than severity of punishment). The certainty of that punishment, the inevitability of getting caught, prosecuted, punished deters the public, not the severity of prison time.

Mr. O'Hara's conduct in this case has already resulted in certain punishment, a federal felony conviction, which will affect numerous aspects of his life going forward. A sentence alternative to incarceration constitutes a sentence which is sufficient, but not greater than necessary to comply with the various sentencing considerations. Congress specifically made this sentence available for this particular crime because it believed such a sentence would be sufficient punishment. In Mr. O'Hara's case, such a sentence is appropriate.

In *Gall v. United States*, 552 U.S. 38 (2207), the Supreme Court affirmed the district court's sentence of 36 months probation for a drug conspiracy that netted the defendant over $30,000, despite an advisory guideline range of 30 to 37 months imprisonment, based, in part, on the defendant's lack of criminal history and self-rehabilitation following the offense. *Id.* at 41-42. The Supreme Court rejected the Eighth Circuit's conclusion that a sentence of probation was inadequate and beyond the realm of available sentencing choices and emphasized the fact that a sentence of probation is in fact punishment and is not merely "an act of leniency." *Gall*, 128 S.Ct. at 45-50.

The sentence Mr. O'Hara is requesting of the court is a serious one, befitting the offense of conviction. As the *Gall* Court observed, a felony conviction and a sentence of probation constitutes a serious punishment. While custodial sentences are qualitatively more severe than alternative sentences of equivalent terms, offenders sentenced to alternative sentences are nonetheless subject to conditions which restrict their liberty. *See United States v. Knights*, 534 U.S.

9

112, 119 (2001) (inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled).

For example, in fashioning an alternative sentence, Mr. O'Hara may not leave the judicial district, move, or change jobs without notifying, and, in some instances, receiving permission from their probation officer or the court. *Id*. Such a condition weighs even heavier on Mr. O'Hara who has family living their remaining years outside not only the district, but the United States. In addition, Mr. O'Hara must report regularly to their post-trial officers, permit unannounced visits to his home, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. *See* U.S.S.G. § 5B1.3. Furthermore, Mr. O'Hara will also be subject to individual "special conditions" imposed by the court. Finally, Mr. O'Hara will always face the possibility of harsh punishment if a condition of his release is violated. *See* Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) (probation is not merely letting an offender off easily).

In addition, as the court is acutely aware, a federal conviction is a stigma that blights a life forever and has serious and severe consequences on not just Mr. O'Hara, but also his family. A simple Google search reveals Mr. O'Hara's crimes and transgressions in explicit detail. Such punishment provides a permanent reminder of Floyd's wrong doing, and for Floyd, carries a high degree of guilt and shame. The severe guilt and shame of letting down his family, wife, and children has caused him to reflect deeply on the consequences of his actions. Mr. O'Hara is certain that he never wants to get wrapped up in anything like this again.

## **CONCLUSION**

Mr. O'Hara has expressed clear remorse for his offense and will never re-offend. The past two years have not only shown that Mr. O'Hara has the ability to rehabilitate himself, but also that he will never lose the support of those who love him. Support he needs to keep moving in the right

direction. As the parsimony provision commands, this court should impose the minimum sentence necessary to accomplish the rehabilitative and other purposes of criminal punishment. As former Attorney General Holder remarked, "we need to ensure that incarceration is used to punish, deter and rehabilitate — not merely to convict, warehouse and forget." Department of Justice, Attorney General Eric Holder Delivers Remarks at the Annual Meeting of the American Bar Association's House of Delegates (Aug. 12, 2013), http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html. These words remain true even under a new Department of Justice Administration. Mr. O'Hara pleads this Honorable Court to impose a sentence alternative to incarceration, which is sufficient, but not greater than necessary to comply with the various sentencing considerations.

        Respectfully submitted,

        /s/ Gal Pissetzky\
        Gal Pissetzky and Adam Bolotin\
        Attorneys for Floyd O'Hara\
        53 W. Jackson Blvd., Suite 1515\
        Chicago, IL 60604\
        (312) 566-9900

## CERTIFICATE OF SERVICE

The undersigned, Gal Pissetzky, hereby certifies that in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, and the General Order on Electronic Case Filing (ECF), the

**FLOYD OHARA'S SENTENCING MEMORANDUM**

was served on December 3, 2018 pursuant to the district court's ECF filers to the following:

Assistant United States Attorney
219 S. Dearborn St., 5th Floor
Chicago, IL 60604

Respectfully submitted,

/s/ Gal Pissetzky_____
Gal Pissetzky
Attorney for Floyd O'Hara
53 W. Jackson Blvd., Suite 1515
Chicago, IL 60604
(312) 566-9900